UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN REINHART, et al.,

              Plaintiffs                        Case No. 22-11074

v.

                                      HON. MARK A. GOLDSMITH

CITY OF BIRMINGHAM,

              Defendant.

_____/

**OPINION & ORDER**
**(1) DENYING DEFENDANT'S MOTION TO DISMISS (Dkt. 16) AND**
**(2) DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION (Dkt. 8)**

Two motions are before the Court: Plaintiffs' motion for a preliminary injunction (Dkt. 8) and the City of Birmingham's motion to dismiss (Dkt. 16). For the reasons set forth below, the Court denies both motions.[1]

**I. BACKGROUND**

Plaintiffs John Reinhart, Anthony Wenzel, and Robert Ziegelman bring this action against the City of Birmingham, asserting that a City construction project that will reduce parking on South Old Woodward Avenue between Brown Street and Landon Street violates the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. Compl. ¶¶ 1–5, 51, 53–72 (Dkt. 1). All three Plaintiffs allege that they are disabled in ways that substantially limit their ability to walk. Id. ¶¶ 11, 16, 20. Reinhart sometimes uses a walker. Id. ¶ 13. Wenzel "can tolerate short walks of a block or less," but "cannot walk more than a block and a half because of his disability." Id. ¶ 18. All three

---

[1] In addition to the City's motion to dismiss, the briefing includes Plaintiffs' response (Dkt. 20) and the City's reply (Dkt. 21). In addition to Plaintiffs' motion for a preliminary injunction, the briefing includes the City's response (Dkt. 14) and Plaintiffs' reply (Dkt. 19). The Court held a hearing on both motions on August 22, 2022.

Plaintiffs have parking permits that enable them to park in spaces designated for people with disabilities.  Id. ¶¶ 12, 17, 21.

All three Plaintiffs also allege that they regularly drive to downtown Birmingham and utilize the parking currently available in the vicinity of the project.  Reinhart regularly drives to downtown Birmingham to access his office and a Pilates studio, both located at 555 South Old Woodward Avenue (the 555 Building), as well as other establishments in the area.  Id. ¶¶ 10, 13.  When he visits South Old Woodward Avenue, Reinhart parks in front of the Pilates studio, in an accessible street parking space, or in an ordinary street parking space as close to his destination as possible to minimize the distance he must travel to his destination.  Id. ¶ 13.[2]

Wenzel regularly drives to downtown Birmingham to access Birmingham Ultimate Fitness, which is located in the 555 Building.  Id. ¶¶ 14–15.  When he visits businesses on South Old Woodward Avenue, Wenzel parks either in an accessible street parking space or in the ordinary street parking space closest to the building to minimize the distance he must travel to access those establishments.  Id. ¶ 18.

Ziegelman regularly drives to downtown Birmingham to visit his office in the 555 Building, the CVS Pharmacy, the Phoenicia restaurant, and other businesses on South Old Woodward Avenue.  Id. ¶ 19.  When he visits these establishments, he parks in an accessible street parking space or in a general street parking space close to his destination to minimize the distance he must travel between his parking space and his destination.  Id. ¶¶ 22–23.

Plaintiffs allege that the project will make South Old Woodward Avenue less accessible to them because it will reduce parking between Brown Street and Landon Street.  Id. ¶¶ 25, 32–34,

[2] The Court uses the term "accessible parking space" to mean a parking space designated for use by individuals with disabilities.  This terminology aligns with language used in, and guidance provided by, the 2010 ADA Title II regulations.  See 28 C.F.R. §§ 35.151, 35.104.  When directly quoting the parties, the Court uses their exact language, which at times includes references to "handicapped" parking and "handicap" parking.

2

51.  Plaintiffs currently allege that the City will eliminate 60 of the 180 on-street parking spaces previously available on this 0.4 mile stretch of South Old Woodward Avenue.  Pl. Resp. to Def. Mot. to Dismiss at PageID.1173-1174.[3]  Plaintiffs allege that two of the nine previously available accessible spaces will be eliminated.  Id. at PageID.1173 n.1.[4]  Plaintiffs thus allege that the City is eliminating 38% of the existing on-street parking in this area, including 22% of the existing accessible on-street parking.  Id. at PageID.1184.  At the motion hearing, the City maintained that there were ten accessible spaces before the project, and that there will be ten such spaces upon completion of the project.

Plaintiffs argue that the alleged changes to on-street parking will make parking, public facilities, and private establishments within the bounds of the project area less accessible to them, especially with increased demand for parking.  Compl. ¶¶ 60, 62.  They allege that most of the street parking spaces closest to their destinations will be eliminated.  Id. ¶ 34.  Wenzel believes he will no longer be able to attend Birmingham Ultimate Fitness because the remaining on-street parking will be too far away.  Id. ¶ 36.

Plaintiffs state that a new retail development in the project area will increase demand for parking, and that increased demand combined with the elimination of existing parking will make "finding available parking and accessing the Project area significantly more difficult, or impossible, for disabled people (like Plaintiffs)"; thus Plaintiffs will be "denied the benefits created by the Project and denied access to South Old Woodward altogether."  Id. ¶¶ 37, 51.

---

[3] Plaintiffs initially alleged that a total of 64 parking spaces would be eliminated but have since revised this claim.  See Compl. ¶ 32; Pl. Resp. to Def. Mot. to Dismiss, at PageID.1173 n.1.

[4] Plaintiffs initially alleged that one of eight previously existing accessible spaces would be eliminated but have since revised these numbers.  See Compl. ¶¶ 24, 59; Pl. Resp. to Def. Mot. to Dismiss, at PageID.1173 n.1.

Plaintiffs assert that the City's motivation for reducing parking along South Old Woodward Avenue is that "[the City] believes [reducing parking] creates a more visually appealing Project." Id. ¶ 39. Plaintiffs assert that similar aesthetic concerns motivate the City's decision to move a bus stop from Bowers Street onto South Old Woodward Avenue, which will lead to removal of "several street parking spots." Id. ¶ 40. Plaintiffs allege that the City was also motivated to eliminate street parking in order to "forc[e] people . . . to walk extended distances." Id. ¶ 42. City officials have acknowledged that reduced parking will require patrons of area businesses to walk further distances. Id. ¶¶ 43–46. Plaintiffs allege that "[t]he City's design of the Project and the removal of street parking and handicapped parking is designed to discriminate against people, like Plaintiffs, who have a substantially impaired ability to walk." Id. ¶ 50.

## II. ANALYSIS

### A. Defendant's Motion to Dismiss for Failure to State a Claim[5]

The City has moved to dismiss Plaintiffs' claims on several grounds. The City argues that Plaintiffs lack standing because they failed to allege a concrete injury in fact; that Plaintiffs' claims are barred by the doctrines of collateral estoppel and res judicata; that Plaintiffs have not provided sufficient factual allegations to support their claims; and that Plaintiffs have not alleged a failure to reasonably accommodate, especially in light of the City's provision of one accessible parking space for every 25 parking spaces. Def. Mot. to Dismiss at PageID.827–828, 847, 849–851.[6]

---

[5] To survive a motion to dismiss, a plaintiff must allege "facts that state a claim to relief that is plausible on its face and that, if accepted as true, are sufficient to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The Court is required to "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007). The defendant has the burden of showing that the plaintiff has failed to state a claim for relief. Id.

[6] The City also argues that Plaintiffs' complaint is "fatal[ly] flaw[ed]" because the Michigan Constitution provides local governments the ability to reasonably control their streets and highways. Def. Mot. to Dismiss at PageID.838, 849. It is unclear the Michigan Constitution

### 1. Standing

Standing requires that the following three elements be met: (i) the Plaintiffs must have suffered a concrete and particularized, actual or imminent, invasion of a legally protected interest; (ii) the complained-of conduct is causally connected to that injury; and (iii) a favorable decision is likely to redress the harm.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–561 (1992).  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"  Id. at 561 (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 889 (1990)).

Plaintiffs have sufficiently pled standing.  They allege that the imminent reduction of parking along South Old Woodward Avenue will make parking more difficult to access, forcing Plaintiffs, who have limited ability to walk because of their disabilities, to park further away from their intended destinations, thereby excluding them from the project area.  A favorable decision could prevent the reduction in parking and preserve Plaintiffs' access to on-street parking and the project area, which they regularly visit.  See Means v. St. Joseph Cnty. Bd. of Comm'rs, No. 3:10-cv-003 JD, 2011 WL 4452244, at *8 (N.D. Ind. Sept. 26, 2011) (finding that ADA plaintiffs had standing to sue for prospective relief related to "the conditions of handicapped-accessible public parking in the vicinity of the Courthouse" where plaintiffs were involved in a pending case that might require them to appear in court).

---

conflicts with the ADA at all, but to the extent that "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" federal law prevails.  R.K. by and through J.K. v. Lee, 575 F. Supp. 3d 957, 992–993 (M.D. Tenn. 2021) (quoting Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000)) (preliminarily enjoining state statute where plaintiffs were likely to succeed on ADA claims).  As a result, the argument relying on the Michigan Constitution is without merit.

The City cites <u>Ross v. City of Gatlinburg</u>, 113 F. App'x 113 (6th Cir. 2004), where the United States Court of Appeals for the Sixth Circuit affirmed a grant of summary judgment for the defendant because "Plaintiffs failed to provide ANY evidence of 'concrete and particularized, actual or imminent' injuries resulting from the City's actions or inactions." <u>Id.</u> at 115 (emphasis in original). The <u>Ross</u> plaintiffs alleged ADA violations related to city parking, sidewalks, restrooms, and more, but failed to specifically "identif[y] any particular street, sidewalk, intersection, parking lot, public building, or facility that purportedly d[id] not comply with the ADA"; "any City service, program, or activity from which they were excluded"; or "any particular incident on any particular date when they suffered discrimination as a result of the City's provision or non-provision of services." <u>Id.</u> at 114.

By contrast, Plaintiffs here allege that the City's action of reducing on-street parking along South Old Woodward Avenue between Brown Street and Landon Street will make parking spaces in that area difficult for them to access, thus inhibiting their access to the project area and particular establishments within it—including offices, a Pilates studio, Birmingham Ultimate Fitness (all located in the 555 Building), a CVS Pharmacy, and the Phoenicia restaurant—due to their disabilities. <u>See</u> <u>Compl.</u> ¶¶ 13, 15, 19. Plaintiffs have alleged a concrete and redressable injury caused by the challenged conduct. <u>See</u> <u>Lujan</u>, 504 U.S. at 560–561. They have standing to bring this action.

### 2. Res Judicata and Collateral Estoppel

The City argues that Plaintiffs' claims are barred because of prior litigation brought by Erica Coulston against the City in which Coulston sought ADA-compliant parking spaces, pedestrian sidewalk intersections, and curb ramps. Def. Mot. to Dismiss at PageID.856–861. <u>See</u>

6

Compl., <u>Coulston v. City of Birmingham</u>, No. 2:19-cv-13038 (E.D. Mich. Oct. 15, 2019) (Dkt. 1) (<u>Coulston</u> Compl.).  Coulston, who uses a wheelchair, contended that ADA-designated spaces and meters in the City's shopping district were not safely usable by her, because, among other things, they lacked proper access aisles or had excessive slopes that could cause a wheelchair to roll away. <u>Coulston</u> Compl. ¶¶ 35, 37.

The <u>Coulston</u> litigation resulted in a May 2020 consent decree requiring the City to take certain measures to make parking spaces, pedestrian crossings, and curbs ADA-compliant.  Def. Mot. to Dismiss at PageID.856–861; Consent Decree, <u>Coulston v. City of Birmingham</u>, 2:19-cv-13038 (Dkt. 7).  The geographic area at issue in the <u>Coulston</u> litigation and covered by its consent decree includes the stretch of South Old Woodward Avenue between Brown Street and Landon Street.  <u>See</u> Ex. 4 to Consent Decree; Second Annual Report Regarding ADA Updates, <u>Coulston v. City of Birmingham</u>, No. 2:19-cv-13038 (E.D. Mich. Jan. 25, 2022) at 2–3 (Dkt. 11).  Plaintiffs Reinhart, Wenzel, and Ziegelman were not parties to the <u>Coulston</u> litigation.

Although there is some similarity between the <u>Coulston</u> litigation and the instant case, res judicata does not bar this action.  "The preclusive effect of a federal-court judgment is determined by federal common law." <u>Taylor v. Sturgell</u>, 553 U.S. 880, 891 (2008); <u>Hamilton's Bogarts, Inc. v. Michigan</u>, 501 F.3d 644, 650 (6th Cir. 2007).  Res judicata, often referred to as claim preclusion, "extinguishes all rights of the plaintiff to remedies against the defendant with respect to . . . the transaction, or series of transactions, out of which the action arose." <u>Walker v. Gen. Tel. Co.</u>, 25 F. App'x. 332, 336 (6th Cir. 2001) (quoting <u>J.Z.G. Res., Inc. v. Shelby Ins. Co.</u>, 84 F.3d 211, 215 (6th Cir. 1996)) (punctuation modified).  Res judicata applies where (i) the first action resulted in a final decision on the merits; (ii) the second action involves the same parties, or their privies, as the first; (iii) the second action raises an issue which either was litigated or should have been

litigated in the first action; and (iv) there is identity of claims.  Walker, 25 F. App'x at 336 (citing Sanders Confectionary Prod., Inc. v. Heller Fin., Inc., 973 F.2d 474, 480 (6th Cir. 1992)).

Plaintiffs concede that a consent decree is a final decision on the merits for purposes of claim preclusion. Pl. Resp. to Def. Mot. to Dismiss at PageID.1192.[7] However, the other requirements of res judicata have not been met.

For one thing, no party in the action at hand was a party in the Coulston litigation or a privy to one.  A privy is "a successor in interest to [a] party, one who controlled the earlier action, or one whose interests were adequately represented [in the prior action]."  Sanders Confectionary Prod., 973 F.2d at 481.  Adequate representation requires that (i) "[t]he interests of the nonparty and her representative are aligned," and (ii) "either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty." Taylor, 553 U.S. at 900.

The City itself characterizes Coulston as "an unrelated non-party."  Def. Resp. to Pl. Mot. for Prelim. Inj., at PageID.531.  The City does not argue that Plaintiffs have a legal relationship to Coulston, that they controlled the Coulston litigation, that Coulston understood herself to be acting as a representative for the Plaintiffs, or that the Coulston court took care to protect Plaintiffs' interests in that litigation.  As a result, Plaintiffs are not in privity with Coulston and are not barred by res judicata.

Additionally, this action does not raise issues that were actually litigated in the Coulston litigation.  Coulston's claim arose out of the City's failure to make parking spaces, street crossings, municipal parking, and other services accessible to her and others.  Coulston Compl. ¶ 10.  In

---

[7] See Arizona v. California, 530 U.S. 392, 414 (2000) (holding that a consent decree can serve as basis for claim preclusion); Blakely v. U.S., 276 F.3d 853, 866 (6th Cir. 2002) ("A consent judgment, which has been freely negotiated by the parties and has been approved by the court, has the full effect of a final judgment for purposes of claim preclusion.").

terms of parking, Coulston's complaint was focused on ADA-designated spaces lacking technical accessibility features.  As one example, Coulston asserted that most of the City's on-street ADA designated parallel parking spaces were inaccessible to her because they lacked access aisles, or, where access aisles existed, they had slopes that made them inaccessible to her as a wheelchair user.  Id. ¶¶ 35, 37.  Coulston did not allege that the City was reducing the overall number of parking spaces in violation of the ADA.  See Coulston Compl.; Coulston Consent Decree.  And Plaintiffs argue that these claims could not have been raised as part of the Coulston litigation, since the Coulston litigation settled before the project that is the subject of the instant action was designed or commenced, Pl. Resp. to Def. Mot. to Dismiss at PageID.1190—a point the City does not challenge in its reply.

Finally, there is no identity of claims.  "Identity of causes of action means an 'identity of the facts creating the right of action and of the evidence necessary to sustain each action.'"  Walker, 25 F. App'x at 336 (quoting Sanders Confectionary Prods, 973 F.2d at 484)).  Given that Plaintiffs are raising different issues than Coulston raised, different evidence will be necessary to support their claims.

The City fares no better in attempting to use collateral estoppel as a bar to the instant action.  Collateral estoppel, or issue preclusion, bars suit where (i) a prior action resulted in a final judgment on the merits, (ii) the same issue was actually litigated and was necessary to the outcome of the prior action, and (iii) the party against whom estoppel is sought had a full and fair opportunity to litigate their claims in the prior action.  Georgia-Pac. Consumer Prod. LP v. Four-U-Packaging, Inc., 701 F.3d 1093, 1098 (6th Cir. 2012).

While the parties agree that the Coulston consent decree was a final judgment on the merits, Pl. Resp. to Def. Mot. to Dismiss at PageID.1192, the other requirements of issue preclusion are not met.  As discussed above, the precise issue in this case was not raised in the Coulston litigation.

Nor was any issue actually litigated, given that the litigation culminated in a consent decree.  See Arizona, 530 U.S. at 414.  Finally, Plaintiffs here were not parties to or in privity with parties to the Coulston litigation, so they have not had a full and fair opportunity to litigate their claims.

### 3. Sufficiency of Plaintiffs' Factual Allegations

The City argues that Plaintiffs' claims should be dismissed because Plaintiffs have failed to allege facts sufficient to support their claims.  See Def. Mot. to Dismiss at PageID.847.  The City asserts that, to establish a prima facie case under Title II of the ADA, a plaintiff must plausibly allege that they (i) have a disability, (ii) are otherwise qualified, and (iii) are being excluded from or denied the benefits of a public program or service or are being discriminated against by a public entity.  Id. (citing Kaltenberger v. Ohio Coll. of Podiatric Med., 162 F.3d 432, 435 (6th Cir. 1998) and Jones v. City of Monroe, 341 F.3d 474, 477 (6th Cir. 2003)).  The City argues that, to prove discrimination, Plaintiffs must proceed under one of three theories: intentional discrimination, disparate impact, or failure to make a reasonable accommodation.  Id. at PageID.847 (citing Tsombanidis v. West Haven Fire Dep't, 352 F. 3d 565, 573 (2d Cir. 2003)).  The City then asserts that Plaintiffs fail to allege facts that support a claim of discrimination under any of these theories. Id.

However, Plaintiffs clearly proceed under the theory that they are being denied the benefits of a public parking program and under the theory that the City is intentionally discriminating against them, and they allege facts in support of both theories.  Plaintiffs are required only to allege "facts that state a claim to relief that is plausible on its face and that, if accepted as true, are sufficient to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.  Here, Plaintiffs have alleged that they are individuals with disabilities, who all have a significantly limited ability to walk, and who will be denied access to the facilities and establishments located within the bounds of a public construction project because of the City's choice to eliminate a

significant number of parking spaces. In addition, Plaintiffs have alleged some facts that could support the existence of animus toward, or at least disregard for, individuals with disabilities—specifically, the City's intent to decrease the availability of parking with the knowledge that individuals parking in downtown Birmingham will be required to walk further distances as a result. These facts, presently accepted as true, are sufficient to raise a right to relief above the speculative level.

### 4. Reasonable Accommodation

The City argues that Plaintiffs' case should be dismissed because (i) Plaintiffs do not allege the City has failed to reasonably accommodate them, and (ii) the City's provision of accessible parking spaces is a reasonable accommodation that is and will remain in place. Def. Mot. to Dismiss at PageID.849–850. However, Plaintiffs are not currently styling their claims as a failure to reasonably accommodate; they assert that the City (i) is depriving them of access to the on-street parking program and the project area by eliminating parking in a manner that violates a particular regulation promulgated to implement the provisions of the ADA, and (ii) is intentionally discriminating against them. The City offers no authority holding that an ADA case must be dismissed for failure to plead denial of a reasonable accommodation in this context.

The City does cite Ehrlich v. Gatta in support of its argument. No. 07 Civ. 11597, 2009 WL 3213715 (S.D.N.Y. Oct. 5, 2009). In that case, an ADA plaintiff brought a failure to accommodate claim on the grounds that the defendants had provided an insufficient number of accessible parking spaces for disabled rail commuters with parking permits that allowed them to park in such spaces. Id. at *1. The plaintiff asserted that, because there were not enough accessible spaces relative to the number of people who had been issued permits, such spaces were often unavailable, and he was regularly ticketed for parking in metered, time-limited spaces instead. Id. at *2. The district court looked to federal regulations to determine what constitutes a reasonable

11

accommodation and found that public entities are required to provide an adequate number of accessible parking spaces in parking lots and garages.  Id. at *3 (citing 28 C.F.R. Pt. 35, App. A). The defendant was complying with New York regulations that required nine accessible parking spaces for every 401–500 total parking spaces, and the plaintiff had not demonstrated that this was not a reasonable accommodation.  Id. at *4.  As a result, the court dismissed his ADA claims.  Id. The City argues that because it is providing one ADA-compliant space for every 25 general spaces—a number based on the ADA Accessibility Guidelines (ADAAG) requirements for parking lots and parking garages—Plaintiffs' complaint here should also be dismissed.  Def. Mot. to Dismiss at PageID.850 (citing ADA Accessibility Guidelines for Building and Facilities, § 4.1.2(5)(a)).

While Ehrlich provides support for the City's arguments on the merits, it does not provide sufficient authority to dismiss Plaintiffs' claims at this stage in the litigation.  It relates to a case that was styled as a reasonable accommodation claim, while Plaintiffs base their action on separate ADA theories.  And it does not involve a municipality's decision to eliminate pre-existing parking that historically enabled disabled individuals to access a particular geographic area.

Plaintiffs have stated a plausible ADA claim.  The City's motion to dismiss is denied.

**B. Plaintiffs' Motion for a Preliminary Injunction**

To determine whether a preliminary injunction should be granted, a district court examines four factors: "(1) whether the plaintiff has established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief."  Hamad v. Woodcrest Condo. Ass'n, 328 F.3d 224, 230 (6th Cir. 2003) (citation omitted, punctuation modified).  These are "factors to be balanced, not prerequisites that must be met."  Mich. Bell. Tel. Co. v. Engler, 257 F.3d 587, 592

12

(6th Cir. 2001) (citation omitted, punctuation modified).  "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal."  Gonzales v. Nat'l Bd. of Med. Exam'rs, 225 F.3d 620, 625 (6th Cir. 2000).  Plaintiffs bear the burden of demonstrating that they are entitled to a preliminary injunction.  Wilson v. Williams, 961 F.3d 829, 837 (6th Cir. 2020).

### 1. Likelihood of Success on the Merits

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Local governments are public entities.  Ability Ctr. of Greater Toledo v. City of Sandusky, 385 F.3d 901, 904 (6th Cir. 2004) (citing 42 U.S.C. § 12131(1)(A) & (B)). "[T]he phrase 'services, programs, or activities' encompasses virtually everything that a public entity does."  Johnson v. City of Saline, 151 F.3d 564, 569 (6th Cir. 1998).  In the Sixth Circuit, claims for intentional discrimination and claims for reasonable accommodation are both cognizable under Title II.  Roell v. Hamilton Cnty., 870 F.3d 471, 488 (6th Cir. 2017).  In addition, the Sixth Circuit has recognized ADA claims arising from alleged violations of implementing regulations and related accessibility guidelines.  See Ability Ctr. of Greater Toledo, 385 F.3d at 907.

Plaintiffs' complaint explicitly asserts one claim—a violation of Title II of the Americans with Disabilities Act—but it is clear from the allegations in the complaint and from subsequent briefing that Plaintiffs are proceeding under two theories.  First, Plaintiffs assert that significantly reducing parking on South Old Woodward Avenue deprives them of the benefits of on-street parking and access to the project area.  See Pl. Mot. for Prelim. Inj. at PageID.54–55.  Second, Plaintiffs assert that the City is intentionally discriminating against them by reducing parking on South Old Woodward Avenue.  See id. at PageID.54, 58–61.

13

### a. Reduced Parking Claim

Plaintiffs argue first that by reducing the number of parking spaces on South Old Woodward Avenue as part of the project, the City is denying them the service of a public entity. Plaintiffs are unlikely to succeed on this claim.

Plaintiffs largely center their reduced parking argument on a regulation promulgated to implement the provisions of the ADA.  That regulation, 28 C.F.R. § 35.151, provides that when a public entity alters a facility "in a manner that affects or could affect the usability of the facility," the facility shall "to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible and usable by individuals with disabilities."  Ability Ctr. of Greater Toledo, 385 F.3d at 904 (quoting 28 C.F.R. § 35.151(b)[8]) (punctuation modified). Facilities include "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located."  28 C.F.R. § 35.104.

It is somewhat unclear how claims alleging a violation of 28 C.F.R. § 35.151 should be characterized—whether as disparate impact claims, reasonable accommodation claims, or something else.[9]  But it is clearly established in the Sixth Circuit that this regulation "effectuates a mandate of Title II and is therefore enforceable through the private cause of action available under

---

[8] This provision applies to alterations of facilities commenced after January 26, 1992.  28 C.F.R. § 35.151(b)(1).

[9] See Ability Ctr. of Greater Toledo, 385 F.3d at 904 n.4 (noting that "the parties and the district court characterized the defendants' failure to meet the requirements of § 35.151 as a form of disparate impact discrimination," but stating, "[i]t is not clear that characterization is apt," and declining to decide how such violations should be characterized because it was unnecessary to the appeal at hand); see also Mote v. City of Chelsea, 252 F. Supp. 3d 642 (E.D. Mich. 2017) (holding that plaintiffs had stated a claim under Title II of the ADA pursuant to 28 C.F.R. § 35.151 without discussing in which category that claim belonged).

the statute." <u>Ability Ctr. of Greater Toledo</u>, 385 F.3d at 907.  While <u>Ability Center</u> did not decide how such claims should be characterized, the reasoning of the decision suggests that such claims may fall into the reasonable accommodation category.  <u>See</u> <u>id.</u> at 908 (". . . Title II mandates not only that public entities refrain from intentionally discriminating against disabled individuals but that they also make certain <u>accommodations</u> to the disabled in the course of providing public services, which should include removing architectural barriers in the manner prescribed by 28 C.F.R. § 35.151.") (emphasis added).

Regardless of how it should be characterized, the regulation "imposes a positive mandate to ensure that all newly constructed public 'facilities'—and in particular streets and sidewalks comprising pedestrian travel routes—include certain specific accessibility features[.]" <u>Mote</u>, 252 F. Supp. 3d at 652 (citing <u>Tennessee v. Lane</u>, 541 U.S. 509 (1978) and <u>Ability Ctr. of Greater Toledo</u>, 385 F.3d).  For alterations beginning on or after March 15, 2012, construction must comply with the 2010 ADA Standards for Accessible Design (2010 Standards), "which consist of the 2004 [ADA Accessibility Guidelines] and the requirements contained in § 35.151."  § 35.151(c)(3); § 35.104.

This regulation likely applies to modifications of on-street public parking, like the modifications at issue in this case.  While the 2010 Standards do not explicitly address on-street parking, "nothing in 28 C.F.R. § 35.151 suggests that when technical specifications do not exist for a particular type of facility, public entities have no accessibility obligations." <u>Fortyune v. City of Lomita</u>, 766 F.3d 1098, 1103 (9th Cir. 2014).   In light of the regulation's "mandate that 'each' newly constructed or altered facility be readily accessible," courts have held that 28 C.F.R. §35.151 "require[s] that all public on-street parking facilities constructed or altered after the ADA's effective date be accessible." <u>See, e.g.</u>, <u>id.</u>  at 1100, 1106 (holding that disabled individual stated

a claim under the ADA where none of the City of Lomita's public on-street parking was accessible to people with disabilities).

The City argues that it is already complying with any relevant technical specifications required by the ADA itself as well as by the <u>Coulston</u> consent decree, which requires the City to follow the guidance of a number of government documents, including the United States Department of Justice (DOJ) ADA Parking Compliance Brief.[10]  <u>See</u> Def. Resp. to Pl. Mot. for Prelim. Inj. at PageID.532–533; <u>Coulston</u> Consent Decree, at 2–3.  The City states that it is also already meeting its obligation under the <u>Coulston</u> consent decree and DOJ guidelines to provide one ADA-compliant parking space for every 25 parking spaces.  Def. Resp. to Pl. Mot. for Prelim. Inj. at Page.ID.525, 537, 541.

However, the City's arguments to this effect do not address the crux of Plaintiffs' ADA claim.  Plaintiffs do not argue that the City is not complying with the 2010 Standards, other government guidance documents, or the <u>Coulston</u> consent decree.  Plaintiffs do not argue that individual parking spaces are not ADA compliant, that the City is creating an impermissible proportion of general parking spaces to ADA compliant spaces, or that technical accessibility features of sidewalks, roads, or parking spaces have been overlooked.

Instead, Plaintiffs argue that a general reduction of parking spaces on South Old Woodward Avenue is a violation of the ADA because increased demand for parking, combined with decreased spaces, will require Plaintiffs to park further away from the sidewalks and public facilities nearby, as well as further away from their workplaces, exercise facilities, and other establishments, rendering those facilities and establishments inaccessible to them because of their disabilities.  <u>See</u> Pl. Reply to Def. Resp. to Pl. Mot. for Prelim. Inj. at PageID.1154–1155.  Plaintiffs appear to argue that the City is violating 28 C.F.R § 35.151 because an overall reduction in parking will render

---

[10] Available at: http://www.ada.gov/restripe.pdf.

South Old Woodward Avenue less accessible; thus the City is engaging in an alteration of a public facility but is not, "to the maximum extent feasible," ensuring that the facility as modified will be easily usable and accessible by individuals with disabilities.  See id.

In support of this argument, Plaintiffs point to Mote, 252 F. Supp. 3d at 645–646, where plaintiffs adequately stated a claim against the City of Chelsea pursuant to Title II and 28 C.F.R. § 35.151.  The City of Chelsea had "removed existing ramps and curb cuts" and approved renovations by private businesses that omitted or actively removed existing accessibility features, for example, by replacing existing ramps with stairs.  Id. at 646.  Mote might be more analogous to the case at hand if existing accessible spaces were being eliminated as part of the City's modifications on South Old Woodward Avenue, but the City claims it is doing no such thing.  The idea that removing general, non-ADA parking spaces is equivalent to removing existing accessibility features like curb cuts and ramps requires a greater analytical leap.

Courts have been receptive to suits by disabled plaintiffs claiming deprivation of the benefits of public parking programs where plaintiffs were not able to access particular destinations, but those cases largely dealt with a total lack of accessible parking or difficulty in accessing the plaintiff's own residence.  See Gudkovich v. City of Chicago, No. 17 C 8714, 2020 WL 419409, at *3 (N.D. Ill. Jan. 27, 2020) (denying a motion to dismiss ADA claims where the plaintiff alleged he was denied the benefit of public street parking that was too far from his residence); Lang v. Crocker Park LLC, No. 1:09 CV 1412, 2010 WL 3326867, at *3–*5 (N.D. Ohio Aug. 20, 2010) (denying motion to dismiss where ADA plaintiff alleged that the defendant provided on-street parking in general, but did not provide any on-street accessible parking spaces); Hammond v. City of Red Bluff, No. 2:14-cv-01136-TLN-CMK, 2014 WL 6612059, at *1–*4 (E.D. Cal. Nov. 20, 2014) (denying motion to dismiss where disabled plaintiff alleged a violation of the ADA because on-street parking available in downtown area did not include any accessible spaces); Bassilios v.

17

City of Torrance, 166 F. Supp. 3d 1061, 1065–1066, 1084–1085 (C.D. Cal. 2015) (under ADA and other theories, ordering that tenant who had difficulty walking more than 50 feet due to cerebral palsy was entitled to establishment of an accessible parking space on street near her apartment building); Meekins v. City of New York, 524 F. Supp. 2d 402, 404–405, 412 (S.D.N.Y. 2007) (denying a motion for judgment on the pleadings where a disabled motorist, restricted to a van-transported wheelchair, alleged that ineligibility for special parking permit impeded his access to cultural and medical institutions).

Plaintiffs' circumstances here differ from those presented in the above cases. The City has provided some accessible spaces, and it claims not to be diminishing them. Though limited in mobility, Plaintiffs are not entirely precluded from reaching multiple destinations. And destinations that have become problematic for Plaintiffs do not play the central role of a residence. All of these distinctions chip away at Plaintiffs' likelihood of success.

A Sixth Circuit decision also supports the conclusion that Plaintiffs are not likely to succeed on their ADA claims. See Jones v. City of Monroe, 341 F.3d 474 (6th Cir. 2003), overruled on other grounds by Lewis v. Humboldt Acquisition Corp., Inc., 681 F.3d 312 (6th Cir. 2012). In Jones, a plaintiff with multiple sclerosis challenged the City of Monroe's parking program under Title II of the ADA because she could not access free all-day public parking that would enable her to access her workplace in downtown Monroe. Id. at 474–475. While the City provided free all-day parking within two blocks of her office, the plaintiff was "not able to walk from any of these free all-day parking lots to her office due to her disability." Id. at 475. To access her workplace, the plaintiff parked all day in free public one-hour parking spaces closer to the building and was repeatedly ticketed for doing so. Id. On a motion for preliminary injunction, the plaintiff requested that the City reserve a free parking space for her near her office, or stop ticketing her for parking all day in one-hour time limited spaces near her office. Id. at 475–476. The district

18

court denied her motion on the ground that she was unlikely to succeed on the merits of her claim, and the Sixth Circuit affirmed the denial.  Id. at 476.

To assess whether the plaintiff was being unlawfully excluded from or denied the benefits of a program or service, the Sixth Circuit first determined that the benefit at issue was the provision of free all-day and one-hour parking in particular downtown locations, not free downtown parking that enabled access to an individual's destination of choice.  Id. at 477–479.  The Sixth Circuit held that the lower court did not err in determining that the plaintiff was not excluded from the parking benefits offered by Monroe because the one-hour time limit on certain spaces applied to both disabled and nondisabled individuals and because the available one-hour parking and the available all-day parking both had spaces for disabled and nondisabled individuals.  Id. at 478.

Here, Plaintiffs argue they will be denied the benefit of the City's on-street parking program if they are forced to park further away from their intended destinations and are unable to walk from their parking spaces to those destinations.  Such an argument is difficult to distinguish from the Jones plaintiff's argument that she was denied the benefit of free all-day public parking where that parking was too far away from her workplace.  The City of Monroe in Jones provided accessible spaces in the downtown locations where one-hour and all-day parking was provided; the City of Birmingham is providing ADA-compliant spaces in the locations where parking will remain on South Old Woodward Avenue.  Jones suggests that Plaintiffs' claim is tenuous.

On the present record, the Court cannot say that Plaintiffs are likely to succeed on the merits of this claim.

### b. Intentional Discrimination Claim

Plaintiffs also argue that the City is intentionally discriminating against them because of their disabilities.  Claims of intentional disability discrimination under the ADA are evaluated under the McDonnell Douglas burden-shifting framework.  Anderson v. City of Blue Ash, 798

F.3d 338, 356 (6th Cir. 2015) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).

Under this framework, the Plaintiff must first establish a prima facie case of discrimination by

showing that: "(1) she has a disability; (2) she is otherwise qualified; and (3) she was being

excluded from participation in, denied the benefits of, or subjected to discrimination under the

program because of her disability." Id. at 356–357 (footnote omitted).

To show that the discrimination was "because of" the plaintiff's disability, "the [p]laintiff

must present evidence that animus against the protected group was a significant factor in the

position taken by municipal decision-makers themselves or by those to whom the decision-makers

were knowingly responsive." Id. at 357 (punctuation modified). The plaintiff must also

demonstrate that "the discrimination was intentionally directed toward him or her in particular."

Id. (emphasis in original); see also Dillery v. City of Sandusky, 398 F.3d 562, 568 (6th Cir. 2005),

overruled on other grounds by Lewis v. Humboldt Acquisition Corp., 681 F.3d 312, 317 (6th Cir.

2012) ("Acts and omissions which have a disparate impact on disabled persons in general [are] not

specific acts of intentional discrimination against [the plaintiff] in particular.") (punctuation

modified); Rose v. Wayne Cnty. Airport Auth., 210 F. Supp. 3d 870, 884 (E.D. Mich. 2016)

(dismissing intentional disability discrimination claim where plaintiffs failed to allege any facts

that could support an inference that a public entity's decision to move a public transit stop was

"directed at them individually, or at disabled travelers generally").

So far, the purported evidence of animus toward people with disabilities consists of

statements by city officials acknowledging that patrons of South Old Woodward Avenue

establishments will have to walk longer distances to access those establishments as a result of

reduced parking. See Compl. ¶ 43 (City Commissioner Clinton Baller stated, "yes, people are

going to have to walk twice as far."); Compl. ¶ 44 (Birmingham Mayor Pro Tem Pierre Boutros

stated, "Your patrons will get used to it. They're heathy. They look for wellness. I hope they like

to walk."); Compl. ¶ 45 and Pl. Resp. to Def. Mot. to Dismiss at PageID.1178 n.4 (reflecting another official's statement that: "When Center for Yoga was open, sometimes I had to park all the way down at Landon, I enjoyed the long walk."). Plaintiffs so far do not appear to have asserted that the discrimination was intentionally directed toward the three of them in particular. As a result, they are unlikely to establish a prima facie case.

If Plaintiffs do establish a prima facie case, the City will then have the burden of producing a legitimate, nondiscriminatory reason for its conduct. Anderson, 798 F.3d at 357 (citing Sjostrand v. Ohio State Univ., 750 F.3d 596, 599 (6th Cir. 2014)). The City has already pointed to a variety of legitimate, nondiscriminatory reasons for undertaking the construction project and reducing parking, including: improving pedestrian safety, improving walkability, reducing conflicts, reducing parking across intersections, reducing parking backing into crosswalks, upgrading parking spaces to be ADA compliant, adding greenspace and dining areas, optimizing parking to include electric scooters and bicycles along with cars, and integrating green infrastructure. Def. Resp. to Pl. Mot. for Prelim. Inj. at PageID.527–528.

If the Defendant produces such a reason, Plaintiffs will have the burden of proving that the stated reason is merely pretext for unlawful discrimination. Anderson, 798 F.3d at 357 (citing Sjostrand, 750 F.3d at 599). It is unclear how Plaintiffs here would attempt to demonstrate that the City's stated reasons for the reduction of parking spaces are mere pretext for discrimination against people with disabilities, especially given that Plaintiffs themselves presently vacillate between stating that the purpose of the project was intentional discrimination and stating that the primary purpose of the project was to improve the aesthetics of the area. See, e.g., Pl. Resp. to Def. Mot. to Dismiss at PageID.1179; see also Pl. Mot. for Prelim. Inj. at PageID.60 ("The City has been clear that the main goal of the project was to create something aesthetically pleasing to the Commissioners that future generations will celebrate.") (punctuation modified).

21

As a result, Plaintiffs are unlikely to succeed on this claim.

### 2. Irreparable Harm

"[T]he hallmark of irreparable injury is the unavailability of money damages to redress the injury." Caspar v. Snyder, 77 F. Supp. 3d 616, 640 (E.D. Mich. 2015) (citing Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 550 (6th Cir. 2007)). Additionally, harm may be irreparable where damages are difficult to calculate. Id. (collecting cases). Irreparable harm exists where disabled individuals are precluded from "engaging in normal life activities such as crossing the street or accessing a sidewalk" due to public facilities being inaccessible. Deck v. City of Toledo, 29 F. Supp. 2d 431, 434 (N.D. Ohio 1998).

Plaintiffs' increased difficulty accessing the project area is irreparable harm, in that money damages would not adequately redress the harm—and even if money damages were awarded, they would be difficult to calculate. However, while Plaintiffs have asserted that reduced parking would make the project area totally inaccessible to them, see Pl. Mot. for Prelim. Inj. at PageID.61, the record presently at hand does not demonstrate that they will be totally precluded from the area. ADA-compliant spaces, and some general parking, will still be available. It is not clear how often the available spaces are likely to be otherwise occupied and, therefore, inaccessible to Plaintiffs. While Plaintiff Wenzel has stated that he is unable to walk more than a block and a half due to his disability, see Wenzel Aff. (Dkt. 8-3), Plaintiffs Reinhart and Ziegelman have not yet explained how far they are able to walk, and how close they would need to park in order to preserve meaningful access to the project area.

Where a movant does not establish that definitive harm will likely result from a defendant's proposed course of action, irreparable harm has reduced significance in a court's analysis. See Memphis A. Philip Randolph Inst. v. Hargett, 978 F.3d 378, 391 (6th Cir. 2020) (quoting D.T. v.

Sumner Cnty. Schs., 942 F.3d 324, 327 (6th Cir. 2019)) ("To merit a preliminary injunction, an injury must be both certain and immediate, not speculative or theoretical.") (punctuation modified).

On the whole, consideration of this factor favors the City.

### 3. Harm to Others and the Public Interest

The two remaining factors—whether granting a preliminary injunction would harm others and whether granting a preliminary injunction would serve the public interest—require the Court to evaluate the competing interests raised by both parties.

Plaintiffs argue that they are not seeking to enjoin the entire project, just the elimination of 60 parking spaces as part of the project, and that adding in parking spaces will not significantly delay the project, so others will not be harmed.  Pl. Mot. for Prelim. Inj. at PageID.61–62. The City argues that a preliminary injunction will in fact delay the project.  Def. Resp. to Pl. Mot. for Prelim. Inj. at PageID.547.  The City asserts that it will be subject to contract disputes and legal liability if the project is delayed.  Id.  It argues that the contractors involved, as well as the local businesses in the area, would be harmed by an injunction.  Id.

Plaintiffs argue that a preliminary injunction will serve the public interest because other disabled individuals, not just themselves, will experience increased difficulty accessing South Old Woodward establishments without on-street parking.  Pl. Mot. for Prelim. Inj. at PageID.62–64. And, generally, the public interest is served by protecting the rights of disabled individuals.  Deck, 29 F. Supp. 2d at 434 ("[T]here is significant public interest in eliminating discrimination against individuals with disabilities.").  The City, on the other hand, argues that the public interest would not be served by interfering with the decisions of duly elected City Commissioners.  Def. Resp. to Pl. Mot. for Prelim. Inj. at PageID.548.

A court's involvement in a city's land-use decisions would be a daunting enterprise, as this case demonstrates. It is not altogether obvious how a decision-maker should balance the impact on disabled persons with a city's concern for pedestrian safety, open spaces, and aesthetics. To find that reduced on-street parking near private establishments constitutes a violation of the ADA—even where a city follows the standards for an appropriate ratio of ADA-compliant parking spaces to general parking spaces—could have far-reaching implications for the management of public spaces.

Just one trade-off that the City here had to assess was revealed at the motion hearing. Plaintiffs argued that one of the remaining ADA-compliant spaces will be at the very southern tip of the project area– entirely unhelpful to disabled individuals seeking meaningful access to more northerly establishments they intend to visit. However, as the City responded at the motion hearing, the location for that ADA-compliant space was intended to enable access to a crosswalk and local park at the southern tip of the project area, for those who wanted to enjoy these features. There is no unambiguously correct way to resolve this trade-off.

Both sides have pointed to harms that affect others and that impact the public interest. But neither side makes a decidedly stronger case. This status of relative equipoise counsels against an award of preliminary relief, as Plaintiffs have the burden of establishing the factors supporting issuance of an injunction. See Chopra v. Physicians Med. Ctr., LLC, No. 16-13915, 2017 WL 2602957, at *8 (E.D. Mich. June 15, 2017) (denying motion for preliminary injunction where plaintiffs had not demonstrated a likelihood of success on the merits and where "[t]he harm to Plaintiffs or third parties and the public interest [we]re at best factors in equipoise" because "no factor strongly favor[ed] Plaintiffs").

**4. Balance of Factors**

The preliminary injunction factors are "interrelated considerations that must be balanced together." Malam v. Adduci, 469 F. Supp.3d 767, 773 (E.D. Mich. 2020). The likelihood of success factor, however, is often dispositive. Sunless, Inc. v. Palm Beach Tan, Inc., 33 F.4th 866, 871 (6th Cir. 2022). It has been observed that the likelihood of success necessary to secure a preliminary injunction is inversely proportional to the harm movants will suffer if a preliminary injunction is not granted. Malam, 469 F. Supp. 3d at 773.

Overall, the balance of preliminary injunction factors here does not favor Plaintiffs, who bear the "heavy burden" of establishing an entitlement to preliminary relief. Erard v. Johnson, 905 F. Supp. 2d 782, 789 (E.D. Mich. 2012). They have not demonstrated a likelihood of succeeding on the merits. The harm that a grant of Plaintiffs' motion would inflict on the City—by stopping the project or modifying it as Plaintiffs request—would be certain and significant, in contrast to the undefined scope of the harm to Plaintiffs if 60 parking spaces are eliminated. Further, if Plaintiffs establish their entitlement to some relief after trial, the Court has the ability to fashion relief in a final injunction that would ameliorate any significant harm that might occur, such as requiring the City to designate additional ADA parking spaces.

Considering all the circumstances, it is inappropriate to issue a preliminary injunction on this record. Plaintiffs' motion is denied.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction (Dkt. 8) and the City's motion to dismiss for failure to state a claim (Dkt. 16) are both denied.

SO ORDERED.

Dated:  September 28, 2022                    s/Mark A. Goldsmith
           Detroit, Michigan                        MARK A. GOLDSMITH
                                                            United States District Judge