UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN REINHART,

      Plaintiff                                   Case No. 22-cv-11074

v.

                                              HON. MARK A. GOLDSMITH

CITY OF BIRMINGHAM,

      Defendant.

_____/

**OPINION & ORDER**
**(1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 72)**
**AND (2) DENYING AS MOOT DEFENDANT'S MOTION TO DISMISS FOR**
**VIOLATION OF COURT ORDERS (Dkt. 75)**

Two motions are before the Court: the City of Birmingham's motion for summary judgment (Dkt. 72) and the City's motion to dismiss for violating court orders (Dkt. 75).[1] For the reasons set forth below, the Court grants the City's motion for summary judgment and denies the motion to dismiss as moot.

**I. BACKGROUND**

Plaintiff John Reinhart brings this action against the City of Birmingham, asserting that the City's construction project that reduced parking on South Old Woodward Avenue between Brown Street and Landon Street violates the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. Compl. ¶¶ 1–5, 51, 53–72 (Dkt. 1). Reinhart alleges that he is disabled in ways that substantially

---

[1] Because oral argument will not aid the Court's decisional process, the motions will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the City's motions, the briefing includes Reinhart's response to the City's motion for summary judgment (Dkt. 74), the City's reply in support of its motion for summary judgment (Dkt. 76), Reinhart's response to the motion to dismiss (Dkt. 78), and the City's reply in support of its motion to dismiss (Dkt. 79).

limit his ability to walk. Id. ¶ 11. He submits that he has a parking permit that enables him to park in accessible parking spaces. Compl. ¶ 12; Resp. to Mot. for Summ. J. at 4.[2]

Reinhart regularly drives to downtown Birmingham to access his office and a Pilates studio, both located at 555 South Old Woodward Avenue (the 555 Building), as well as other establishments in the area, and utilized the parking that was available before the project. Compl. ¶¶ 10, 13; Resp. to Mot. for Summ. J. at 5. When he visits South Old Woodward Avenue, Reinhart parks in front of the Pilates studio, in an accessible street parking space, or in an ordinary street parking space as close to his destination as possible to minimize the distance he must travel to his destination. Compl. ¶ 13.

Reinhart alleges that the project, construction for which began in 2022 and has since been completed, made South Old Woodward Avenue less accessible because it reduced parking between Brown Street and Landon Street. Id. ¶¶ 25, 32–34, 51; Br. Supp. Mot. for Summ. J. at 13. The parties agree that the project permanently eliminated 50 to 60 on-street parking spaces previously available on this stretch of South Old Woodward Avenue. Br. Supp. Mot. for Summ. J. at 13 (stating that there were 126 to 131 on-street parking spaces before the project and 83 spaces after the project's completion); Resp. to Mot. for Summ. J. at 6 (submitting that the project eliminated 60 spaces). Before the completion of the project, there were ten accessible spaces, but the spaces were not fully ADA-compliant. Br. Supp. Mot. for Summ. J. at 13. After the project's completion, there are now nine or ten accessible spaces that are ADA compliant. Id. at 13; Resp. to Mot. for Summ. J. at 6.[3] Reinhart argues that the changes to on-street parking makes parking,

---

[2] The Court uses the term "accessible parking space" to mean a parking space designated for use by individuals with disabilities. This terminology aligns with the language used in, and guidance provided by, the 2010 ADA Title II regulations. See 28 C.F.R. §§ 35.151, 35.104.

[3] Reinhart submits that the project eliminated an accessible parking space, leaving only nine spaces. Resp. to Mot. for Summ. J. at 6. The City disputes this and argues that there are still ten

2

public facilities, and private establishments within the bounds of the project area less accessible, especially with increased demand for parking. Resp. to Mot. for Summ. J. at 10–11. He submits that much of the street parking closest to destinations he patronizes have been eliminated. Id. at 10.

Reinhart alleges that the City's motivation for reducing parking along South Old Woodward Avenue was to "improve[] walkability, add[] green space, seating areas, and dining." Id. at 6 (punctuation modified). He further submits that the City proceeded with the project without "ensur[ing] that the [p]roject complied with the ADA." Id. at 7. According to Reinhart, the City's goal of "enhancing the aesthetics of South Old Woodward Avenue" equates to an "intent to discriminate against disabled people." Id. at 8.

Reinhart brings this action alleging that the City's completion of the project discriminated against him based on his disability in violation of Title II of the ADA. Compl. ¶¶ 69–72.[4]

## II. ANALYSIS[5]

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

---

accessible spaces. Br. Supp. Mot. for Summ. J. at 13. Both parties rely on excerpts of deposition testimony from the City's director of public services, Scott Zielinski. However, neither party's cited testimony establishes whether there are now nine or ten accessible spaces. See Zielinski Dep. 84–85; 90–91 (Dkt. 72-4). This dispute is immaterial to the Court's decision.

[4] Since the filing of the complaint, Reinhart's co-plaintiffs Anthony Wenzel and Robert Zeigelman have been voluntarily dismissed from the lawsuit. See 4/24/23 Stip. Order of Dismissal (Dkt. 32); 10/19/23 Stip. Order of Dismissal (Dkt. 53).

[5] In assessing whether a party is entitled to summary judgment on any claim, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming

programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Local governments are public entities. Ability Ctr. of Greater Toledo v. City of Sandusky, 385 F.3d 901, 904 (6th Cir. 2004) (citing 42 U.S.C. § 12131(1)(A), (B)). "[T]he phrase 'services, programs, or activities' encompasses virtually everything that a public entity does." Johnson v. City of Saline, 151 F.3d 564, 569 (6th Cir. 1998). In the Sixth Circuit, claims for intentional discrimination and claims for reasonable accommodation are both cognizable under Title II. Roell v. Hamilton Cnty., 870 F.3d 471, 488 (6th Cir. 2017). In addition, the Sixth Circuit has recognized ADA claims arising from alleged violations of implementing regulations and related accessibility guidelines. Ability Ctr. of Greater Toledo, 385 F.3d at 907.

As the Court has previously discussed in a prior opinion and order in this case, see 9/28/22 Op. & Order at 13 (Dkt. 24), Reinhart's complaint explicitly asserts one claim—a violation of Title II of the ADA—but Reinhart's briefing indicates that he is proceeding under two theories. One theory is that the City is intentionally discriminating against him by reducing parking on South Old Woodward Avenue. See Resp. to Mot. for Summ. J. at 19–23.

A second theory appears to argue that the significant reduction in parking on South Old Woodward Avenue resulting from the project violates 28 C.F.R. § 35.151. See id. at 23–24. That regulation provides that when a public entity alters a facility "in a manner that affects or could affect the usability of the facility," the facility shall "to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible and usable by individuals with disabilities." Ability Ctr. of Greater Toledo, 385 F.3d at 904 (quoting 28 C.F.R. § 35.151(b).[6]

---

forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

[6] Facilities include "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal

Reinhart characterizes this theory as a form of "[d]isparate [i]mpact [d]iscrimination." Resp. to Mot. for Summ. J. at 23.

As explained further below, Reinhart's claim cannot survive summary judgment under either theory because he has not supplied evidence showing a genuine issue of material fact that he is a qualified individual with a disability such that he is subject to the ADA's protections. And even assuming he was a qualified individual under the ADA, Reinhart's claim also fails because he provides no evidence to support a claim that (i) the City intentionally discriminated against him, or (ii) that the project otherwise violated the ADA or § 35.151.

**A. Qualifying Disability**

To prove that he is actually disabled, Reinhart must demonstrate "[1] a physical or mental impairment that [2] substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "The statute enumerates a non-exhaustive list of 'major life activities,' which include 'caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.'" Harrison v. Soave Enter. L.L.C., 826 F. App'x 517, 523 (6th Cir. 2020) (quoting § 12102(1)(A)). The Sixth Circuit has explained that "the term 'major' shall not be interpreted strictly to create a demanding standard." Id. (punctuation modified). Similarly, an "impairment need not prevent, or significantly or severely restrict a major life activity to be substantially limiting." Id. (punctuation modified). "[T]he term 'substantially limits' shall be construed broadly in favor of expansive coverage and is not meant to be a demanding standard." Id. (punctuation modified).

---

property, including the site where the building, property, structure, or equipment is located." 28 C.F.R. § 35.104.

Applying this standard, the Court finds that Reinhart has failed to raise a genuine issue of fact that he is a person with a qualified disability under the ADA. As to the first prong of the analysis—a "physical or mental impairment"—Reinhart has raised a genuine issue of fact that he has a physical impairment. Specifically, Reinhart has supplied evidence of injuries to his back and hip—namely, sacroiliitis and a hip replacement. Resp. to Mot. for Summ. J. at 2–3 (citing Dr. Soo Progress Notes (Dkt. 74-3)).[7] Reinhart's medical records show that he has undergone multiple procedures related to his lower back and hip, including a "right [sacroiliac] joint fusion" in 2018, Dr. Soo Progress Notes at 1, and an L5 radiculopathy procedure in June 2022, see Reinhart Dep. at 32. This evidence is sufficient to create an issue of fact as to whether Reinhart has a physical impairment.

However, Reinhart fails to meet the second prong of the analysis—that these physical impairments substantially impair a major life activity. Although Reinhart submits that these physical impairments substantially limit his ability to walk, Resp. to Mot. for Summ. J. at 17, Reinhart's own testimony and an absence of supporting medical evidence belies his position. As the City points out, Reinhart's medical records indicate that he has "normal movement of all extremities" and that Reinhart "exercise[d] regularly without any significant limitation." 5/27/22 Preoperative Medical Evaluation Form at PageID.2338 (Dkt. 72-10); 5/26/22 Evaluation at PageID.2343 (Dkt. 72-11). Consistent with these medical records, Reinhart testified that—apart

---

[7] Reinhart makes a cursory allegation of knee pain stemming from a prior surgery. See Resp. to Mot. for Summ. J. at 2–3. However, aside from a vague reference to the prior knee surgery in his affidavit, see Reinhart Aff. ¶ 2 (Dkt. 74-2), Reinhart supplies no evidence demonstrating the nature or severity of the injury. Given the absence of such evidence, Reinhart has not raised a genuine issue of fact that he has an impairment stemming from his knee surgery. Woodling v. GeoBuild, LLC, 600 F. Supp. 3d 815, 821 (N.D. Ohio 2022), aff'd, No. 22-3499, 2023 WL 335283 (6th Cir. Jan. 20, 2023) (finding that plaintiff failed to raise an issue of fact on alleged disability where he failed to "present any evidence that would demonstrate the nature and severity of his impairment").

from golf, tennis, pickleball, and other "racquet sports"—his physician, Dr. Soo, did not recommend any restrictions on his activities. Reinhart Dep. at 61–62 (Dkt. 72-6).

In addition, Reinhart testified that, since his join fusion procedure in 2018, he could "walk for an easy – for a mile, mile-and-a-quarter" before having to stop and stretch. Reinhart Dep. at 42. Following his procedure in June 2022, Reinhart was still able to walk long stretches—about "a half a mile or a little further"—without issue. Reinhart Dep. at 56. Indeed, not only can Reinhart walk for relatively long distances, but he seeks out opportunities to do so as part of his exercise. As Reinhart explained:

> In fact . . . I'm constantly working on my skeletal structure okay? Where I park . . . I park all the way up the ramp as far as I can from where I go in so I have to go and walk all the way down and walk up that steep ramp, because I'm exercising my steps, walking very stiff, straight up, so that I'm using the muscles in the lower part of my back. So that's the way I live my life.

Id. at 81. Reinhart testified to exercising at least six days a week and "[s]ometimes 14 days in a row" Id. at 56. He elaborated that his exercise routine includes Pilates, hiking, and walking. Id.

All told, Reinhart's only asserted limitation—that he can walk only a half mile or so before pausing to stretch—is insufficient to raise a genuine issue of material fact that he is substantially limited in the major life activity of walking.

Resisting this conclusion, Reinhart cites 29 C.F.R. § 1630.2(j)(1)(ii)—without further explanation—to argue that Reinhart's condition "substantially limits" his ability to perform the major life activity of walking. Rep. to Mot. for Summ. J. at 16[8]. That regulation provides:

> An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life

---

[8] Reinhart's response incorrectly cites 29 C.F.R. § 1630.2(j)(1)(iii). See Resp. to Mot. for Summ. J. at 16.

7

> activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

29 C.F.R. § 1630.2(j)(1)(iii).

The evidence, as recounted above, shows that Reinhart is not "substantially limited" as compared to the general population. By his own admission, Reinhart is limited only in his ability to walk long distances—i.e., distances of a half-mile or more. Such an impairment is not sufficiently severe to qualify as a substantial limitation on Reinhart's walking. See Andrews v. Tri Star Sports and Entm't Group, Inc., No. 23-5700, 2024 WL 3888127, at *5 (6th Cir. Aug. 21, 2024) (explaining that a plaintiff's condition caused by her asthma was insufficient to qualify as a substantial limitation on her breathing where her breathing was limited "only in . . . isolated, or 'extra strenuous' circumstances").

Reinhart next argues that his exercise routine "including stretching and Pilates" is a "mitigating measure" that allows him to walk. Resp. to Mot. for Summ. J. at 17 (citing 16 C.F.R. § 1630.2(j)(1)(vi)).[9] But the only evidence Reinhart submits to support this theory is his deposition testimony where he purports to quote his doctor as stating: "If you don't do Pilates, you are not going to be able to walk." Reinhart Dep. at 33–34; Resp. to Mot. for Summ. J. at 17.

---

[9] Section 1630.2(j)(1)(vi) provides in part: "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures." Similarly, the ADA's "[r]ules of construction regarding the definition of disability" state: "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as-- (I) medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies; (II) use of assistive technology; (III) reasonable accommodations or auxiliary aids or services; or (IV) learned behavioral or adaptive neurological modifications." 42 U.S.C. § 12102(4)(E)(i).

This testimony is hearsay and does not fall under an applicable exception. Schleife v. Royal Caribbean Cruises, Ltd., No. 19-22776, 2021 WL 1723673, at *4 (S.D. Fla. Apr. 30, 2021) ("Hearsay statements are inadmissible unless the statements fall under an applicable hearsay exception. Generally, a witness may not testify to a doctor's statements on the witness's diagnosis if those statements are offered to prove the truth of the matter asserted, because the doctor's statements are considered pure hearsay.") (punctuation modified). Inadmissible hearsay cannot support an opposition to a motion for summary judgment. See March v. Levine, 249 F.3d 462, 471 (6th Cir. 2001) (holding that the non-moving party in a motion for summary judgment "may not rest on his pleadings, but must come forward with affidavits or other admissible evidence setting forth specific facts showing there is a genuine issue for trial").

Even considering the statement, it does not create an issue of fact because it is vague. It is unclear from the statement whether Reinhart's doctor believes that Pilates functions as the sort of immediate, mitigating measure contemplated by the ADA. See § 12102(4)(E)(i) (listing ameliorative measures such as medication, medical supplies, equipment, or appliances, eyeglasses, prosthetic limbs and devices). Such vague evidence does not create an issue of fact to forestall summary judgment.

Reinhart also submits that "on certain days he experiences pain so significant that it forces him to use a walker just to walk any distance . . . ." Resp. to Mot. for Summ. J. at 17 (citing Reinhart Dep. at 48, 50). He further notes that federal regulations provide that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." Id. (quoting 29 C.F.R. § 1630.2(j)(1)(vii)).

Reinhart's assertion that he is sometimes forced to use a walker is not supported by the record. He points to his deposition testimony in which he stated that his condition requires him to

9

be "very careful" with how he sits because he "can pinch that nerve and . . . [be forced] to use the walker." Reinhart Dep. at 48. But Reinhart later clarified that, at the time of his November 29, 2023 deposition, the last time he used a walker was in June 2022, and only for a "couple days" after his surgery. Id. at 67. A single use of a walker over the course of over a year does not constitute the sort of "episodic" disability to which § 1630.2(j) refers. This evidence fails to show that Reinhart is substantially limited by his impairment.

Perhaps recognizing the lack of evidence supporting his claimed limitation to walking, Reinhart cites several cases to argue that the ADA and its amendments do not require plaintiffs to meet a "demanding standard." Resp. to Mot. for Summ. J. at 17–18.[10] But as courts have explained, though the ADA creates a "relatively low bar," that low bar "is not the same as no bar at all." Medina-Rodriguez v. Canovanas Plaza Rial, Econo Rial, LLC, No. 17-cv-1943, 2021 WL 4485652, at *6 (D.P.R. Sept. 30, 2021) (punctuation modified). Reinhart has failed to provide evidence sufficient to clear that bar.

A review of Reinhart's cited cases only illustrates this point, as the cases largely involved plaintiffs who supplied evidence sufficient to create an issue of material fact regarding their disability. In Myers v. Wickes Furniture Co., No. 06-cv-04951, 2012 WL 567377, at *6–*7 (N.D. Ill. Feb. 21, 2012), the court denied defendant's motion for summary judgment where the plaintiff submitted an affidavit stating that she suffered from pain in her back, groin, and legs, which caused her to limp, and walk with a cane. In Jones v. Honda of Am. Mfg., Inc., No. 3:13-cv-167, 2015 WL 1036382, at *10 (S.D. Ohio Mar. 9, 2015), the court denied the defendant's summary

---

[10] Citing Myers v. Wickes Furniture Co., No. 06-cv-04951, 2012 WL 567377, at *6–*7 (N.D. Ill. Feb. 21, 2012); Matthews v. Pennsylvania Dep't of Corr., 613 F. App'x 163, 165 (3d Cir. 2015); and Jones v. Honda of Am. Mfg., Inc., No. 3:13-cv-167, 2015 WL 1036382, at *13 (S.D. Ohio Mar. 9, 2015).

judgment motion based on evidence that the plaintiff suffered from back pain that "sometimes prevented he from working for weeks at a time."[11]

Unlike the plaintiffs who supplied evidence of their limitations in Jones and Myers, here, Reinhart supplies no evidence that he was substantially limited in his ability to walk. Instead, the evidence shows that Reinhart is not limited in his walking: he seeks out opportunities to walk up and down a steep parking structure ramp, he maintains a strict exercise routine that includes walking and hiking, and he is able to walk at least a half-mile without issue. Reinhart Dep. at 56, 81. Although Reinhart testified to using a walker for a "couple of days" after his June 2022 surgery, he has not used a walker since that time. Id. at 66–67. In sum, Reinhart has not supplied evidence that he is substantially limited in his ability to walk.

Because Reinhart fails to supply evidence supporting his allegation that his impairments substantially limited his ability to walk, he cannot show that he is an individual with a qualified disability under the ADA. Reinhart's failure to create an issue of fact of disability is dispositive of the City's summary judgment motion. However, as explained below, even assuming Reinhart could prove that he is disabled, the Court also concludes that Reinhart fails to raise an issue of fact that he was subject to discrimination in violation of the ADA.

## B. Intentional Discrimination

Reinhart argues that the City intentionally discriminated against him because of his alleged disability. As he points out, Resp. to Mot. for Summ. J. at 19–20, claims of intentional disability discrimination under the ADA are evaluated under the McDonnell Douglas burden-shifting

---

[11] Reinhart's citation to Matthews is even further afield, as that case assessed the sufficiency of the plaintiff's allegations at the motion-to-dismiss stage. Matthews, 613 F. App'x at 165. Matthews provide no guidance for determining whether Reinhart has supplied evidence sufficient to survive summary judgment.

framework. Anderson v. City of Blue Ash, 798 F.3d 338, 356 (6th Cir. 2015) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). To show that the discrimination was "because of" the plaintiff's disability, "the [p]laintiff must present evidence that animus against the protected group was a significant factor in the position taken by municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." Id. at 357 (punctuation modified). The plaintiff must also demonstrate that "the discrimination was intentionally directed toward him or her in particular." Id. (emphasis in original, punctuation modified); see also Dillery v. City of Sandusky, 398 F.3d 562, 568 (6th Cir. 2005), overruled on other grounds by Lewis v. Humboldt Acquisition Corp., 681 F.3d 312, 317 (6th Cir. 2012) ("Acts and omissions which have a disparate impact on disabled persons in general [are] not specific acts of intentional discrimination against [the plaintiff] in particular.") (punctuation modified); Rose v. Wayne Cnty. Airport Auth., 210 F. Supp. 3d 870, 884 (E.D. Mich. 2016) (dismissing intentional disability discrimination claim where plaintiffs failed to allege any facts that could support an inference that a public entity's decision to move a public transit stop was "directed at them individually, or at disabled travelers generally").

To support his argument that the City discriminated against him, Reinhart cites statements from City officials acknowledging that patrons of South Old Woodward Avenue establishments have to walk longer distances to access those establishments as a result of reduced parking. See Resp. to Mot. for Summ. J. at 21. Specifically, Reinhart points to City Commissioner Clinton Baller as stating: "yes, people are going to have to walk twice as far." Id. at 8. He also quotes Mayor Pro Tem Pierre Boutrous as saying: "This is not at all a rushed decision. This is not a mistake. Your patrons will get used to it. They're healthy. They look for wellness. I hope they like to walk." Id. at 9.(punctuation modified). Reinhart asserts that these comments were "made in

12

response to questions from citizens and business owners at the meeting who stated that the Project eliminated too much on-street parking." Id. at 21. He further submits that the statements show that City officials "had no regard for people who . . . struggle[] to walk long distances to access the business area of the project" and that Reinhart "fits squarely in this group against whom the Commissioners expressed discriminatory intent." Id. at 22.

Reinhart's argument fails for multiple reasons. First, his response brief fails to provide the Court with a way of viewing the videos of statements from City officials that he purports to quote. The links and citations provided in Reinhart's response brief do not correlate to the language—or even the same meeting—that Reinhart quotes in his brief. The Court need not entertain factual recitations not presented in the record. Andrews, 2024 WL 3888127, at *5 n.4. Second, even if the Court considered the statements, they do not show that the City directed any discrimination towards Reinhart in particular. Anderson, 798 F.3d at 357. The statements reflect that City officials understood that some pedestrians would have to walk farther to reach their destination. They do not reflect animus toward the disabled or a lack of understanding for the needs of disabled pedestrians. These statements do not raise an issue of fact with respect to Reinhart's claim that the City intentionally discriminated against him.

### C. Disparate Impact

As discussed above, Reinhart also asserts a disparate impact theory of intentional discrimination. Resp. to Mot. for Summ. J. at 23–24. Although Reinhart's characterization of this theory as one of "disparate impact" is new, the Court already addressed a version of this argument on Reinhart's motion for preliminary injunction. See 9/28/22 Op. & Order at 15–16.

Reinhart appears to argue that the project violated 28 C.F.R. § 35.151, which requires that when a public entity alters a facility "in a manner that affects or could affect the usability of the

facility," the facility shall "to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible and usable by individuals with disabilities." Ability Ctr. of Greater Toledo, 385 F.3d at 904 (quoting 28 C.F.R. § 35.151(b)) (punctuation modified).

As this Court has previously explained, 9/28/22 Op. & Order at 14–15, the law is somewhat unclear on how claims alleging a violation of 28 C.F.R. § 35.151 should be characterized—whether as disparate impact claims, reasonable accommodation claims, or something else.[12] But it is clearly established in the Sixth Circuit that this regulation "effectuates a mandate of Title II and is therefore enforceable through the private cause of action available under the statute." Ability Ctr. of Greater Toledo, 385 F.3d at 907. While Ability Ctr. did not decide how such claims should be characterized, the reasoning of the decision suggests that such claims may fall into the reasonable accommodation category. See id. at 908 (". . . Title II mandates not only that public entities refrain from intentionally discriminating against disabled individuals but that they also make certain accommodations to the disabled in the course of providing public services, which should include removing architectural barriers in the manner prescribed by 28 C.F.R. § 35.151.") (emphasis added).

Regardless of how Reinhart's claim should be characterized, the regulation he cites "imposes a positive mandate to ensure that all newly constructed public 'facilities'—and in particular streets and sidewalks comprising pedestrian travel routes—include certain specific

---

[12] See Ability Ctr. of Greater Toledo, 385 F.3d at 904 n.4 (noting that "[t]he parties and the district court characterized the defendants' failure to meet the requirements of § 35.151 as a form of disparate impact discrimination," but stating, "[i]t is not clear that characterization is apt," and declining to decide how such violations should be characterized because it was unnecessary to the appeal at hand); see also Mote v. City of Chelsea, 252 F. Supp. 3d 642 (E.D. Mich. 2017) (holding that plaintiffs had stated a claim under Title II of the ADA pursuant to 28 C.F.R. § 35.151 without discussing in which category that claim belonged).

14

accessibility features[.]" Mote v. City of Chelsea, 252 F. Supp. 3d 642, 652 (E.D. Mich. 2017) (citing Tennessee v. Lane, 541 U.S. 509 (1978) and Ability Ctr. of Greater Toledo, 385 F.3d 901)). For alterations beginning on or after March 15, 2012, construction must comply with the 2010 ADA Standards for Accessible Design (2010 Standards), "which consist of the 2004 [ADA Accessibility Guidelines] and the requirements contained in § 35.151." §§ 35.104, 35.151(c)(3).

This regulation likely applies to modifications of on-street public parking, like the modifications at issue in this case. While the 2010 Standards do not explicitly address on-street parking, "nothing in 28 C.F.R. § 35.151 suggests that when technical specifications do not exist for a particular type of facility, public entities have no accessibility obligations." Fortyune v. City of Lomita, 766 F.3d 1098, 1103 (9th Cir. 2014). In light of the regulation's "mandate that 'each' newly constructed or altered facility be readily accessible," courts have held that 28 C.F.R. § 35.151 "require[s] that all public on-street parking facilities constructed or altered after the ADA's effective date be accessible." See, e.g., id. at 1100, 1106 (holding that disabled individual stated a claim under the ADA where none of the City of Lomita's public on-street parking was accessible to people with disabilities).

Reinhart appears to argue that the City violated § 35.151 because the project resulted in an overall reduction of parking that rendered South Old Woodward Avenue less accessible; thus, the City is engaging in an alteration of a public facility but is not, "to the maximum extent feasible," ensuring that the facility as modified will be easily usable and accessible by individuals with disabilities. See Resp. to Mot. for Summ. J. at 23–24.

In support of this argument, Reinhart cites Fortyune, 766 F.3d at 1103, which held that a disabled individual stated a claim under the ADA where none of the City of Lomita's public on-street parking was accessible to people with disabilities. See Resp. to Mot. for Summ. J. at 23–24.

15

As the Ninth Circuit explained in that case, § 35.151 "require[s] that all public on-street parking facilities constructed or altered after the ADA's effective date be accessible." Fortyune, 766 F.3d 1106. Reinhart also points to cases where courts have denied motions to dismiss claims by disabled plaintiffs asserting that they were deprived of the benefits of public parking programs due to a total lack of accessible parking or difficulty in accessing the plaintiff's own residence. See Resp. to Mot. for Summ. J. at 24–25.[13]

But Reinhart's allegations differ from those presented in the cases on which he relies. He does not allege that he is entirely precluded from accessing destinations along the stretch of South Old Woodward Avenue impacted by the project. Resp. to Mot. for Summ. J. at 6. Indeed, Reinhart concedes that there are at least nine accessible spaces after the project's completion. At worst, this is one fewer accessible space than before the project. Reinhart cites no authority supporting the proposition that a reduction of parking spaces, coupled with increased demand for parking, constitutes a violation of Title II of the ADA.

As the City points out, Br. Supp. Mot. for Summ. J. at 33–34, a Sixth Circuit decision also undermines Reinhart's position. See Jones v. City of Monroe, 341 F.3d 474 (6th Cir. 2003), overruled on other grounds by Lewis v. Humboldt Acquisition Corp., Inc., 681 F.3d 312 (6th Cir. 2012). In Jones, a plaintiff with multiple sclerosis challenged the City of Monroe's parking program under Title II of the ADA because she could not access free all-day public parking that

---

[13] Citing Bassilios v. City of Torrance, 166 F. Supp. 3d 1061, 1065–1066, 1084–1085 (C.D. Cal. 2015) (finding that tenant who had difficulty walking more than 50 feet due to cerebral palsy was entitled to establishment of an accessible parking space on street near her apartment building); Meekins v. City of New York, 524 F. Supp. 2d 402, 404–405, 412 (S.D.N.Y. 2007) (denying a motion for judgment on the pleadings where a disabled motorist, restricted to a van-transported wheelchair, alleged that ineligibility for special parking permit impeded his access to cultural and medical institutions); Hammond v. City of Red Bluff, No. 2:14-cv-01136, 2014 WL 6612059, at *1–*4 (E.D. Cal. Nov. 20, 2014) (denying motion to dismiss where disabled plaintiff alleged a violation of the ADA because on-street parking available in downtown area did not include any accessible spaces).

would enable her to access her workplace in downtown Monroe. Id. at 474–475. While the City provided free all-day parking within two blocks of her office, the plaintiff was "not able to walk from any of these free all-day parking lots to her office due to her disability." Id. at 475. To access her workplace, the plaintiff parked all day in free public one-hour parking spaces closer to the building and was repeatedly ticketed for doing so. Id. On a motion for preliminary injunction, the plaintiff requested that the City reserve a free parking space for her near her office, or stop ticketing her for parking all day in one-hour time limited spaces near her office. Id. at 475–476. The district court denied her motion on the ground that she was unlikely to succeed on the merits of her claim, and the Sixth Circuit affirmed the denial. Id. at 476, 481.

To assess whether the plaintiff was being unlawfully excluded from or denied the benefits of a program or service, the Sixth Circuit first determined that the benefit at issue was the provision of free all-day and one-hour parking in particular downtown locations, not free downtown parking that enabled access to an individual's destination of choice. Id. at 477–479. The Sixth Circuit held that the lower court did not err in determining that the plaintiff was not excluded from the parking benefits offered by Monroe because the one-hour time limit on certain spaces applied to both disabled and nondisabled individuals and because the available one-hour parking and the available all-day parking both had spaces for disabled and nondisabled individuals. Id. at 478.

Here, Reinhart argues that he is denied the benefit of the City's on-street parking program by being forced to park further away from the businesses he frequents on South Old Woodward. See Resp. to Mot. for Summ. J. at 8. Such an argument is difficult to distinguish from the Jones plaintiff's argument that she was denied the benefit of free all-day public parking where that parking was too far away from her workplace. The City of Monroe in Jones provided accessible spaces in the downtown locations where one-hour and all-day parking was provided; the City of

17

Birmingham provides ADA-compliant spaces in the locations where parking remains on South Old Woodward Avenue. Jones's reasoning forecloses Reinhart's claim based on the theory that a reduction of parking spaces, coupled with increased demand for parking, constitutes a violation of Title II of the ADA.

Because Reinhart fails to raise an issue of fact that he is disabled or that he has been subject to discrimination under a either theory of intentional discrimination or disparate impact, the City is entitled to summary judgment.

### III. CONCLUSION

For the above reasons, the City's motion for summary judgment (Dkt. 72) is granted. The City's motion to dismiss for violating court orders by failing to submit to an independent medical examination is denied as moot (Dkt. 75).

SO ORDERED.

Dated: September 26, 2024  s/Mark A. Goldsmith
Detroit, Michigan  MARK A. GOLDSMITH
  United States District Judge